[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 3 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 4 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 5 
Paul Jennings, John Wayne Fore, and Kathryn Ayres appeal from a judgment entered against them on a jury verdict in the Jefferson Circuit Court. Kim Butler appeals the order of the trial court remitting the damages award. We reverse the judgment against Jennings, Fore, and Ayres; we dismiss Butler's appeal from the judgment against the Town of Argo;[1] and we dismiss as moot Butler's appeal from the judgment against Jennings, Fore, and Ayres.
 Facts and Procedural History
Paul Jennings ran for mayor of the Town of Argo in August 1996. The race between Jennings and his opponent was divisive and the election was close. After an election contest, Jennings was declared the mayor by a margin of two votes, and he began serving in November 1996. Shortly after Jennings entered office, the chief of police of Argo, Larry Leonard, left his job and filed an unrelated action against the Town of Argo, members of the city council, and Mayor Jennings.[2] *Page 6 
On February 8, 1997, Kim Butler, a resident of Hayden, Alabama, was driving through Argo when she was stopped by Officer John Wayne Fore, who cited Butler for speeding and issued her a speeding ticket. Later that month, Butler telephoned Mayor Jennings, with whom she had attended high school, to discuss the ticket. Because Jennings was not in at the time of her call, Butler left a message on his answering machine. When Jennings called Butler back, Butler expressed concern that the speeding ticket would cause her insurance rates to increase. According to Butler and Jennings, Butler stated that she was willing to pay the ticket, but she wanted to know if there was any way to keep her insurance company from finding out about the ticket. Jennings told Butler that he had been in office only a short time and that he did not know what, if anything, he could do for her. He told her that he would look into the situation and get back in touch with her.
On February 22, 1997, Jennings called Officer Fore, who was on patrol, into the mayor's office. It was a Sunday night, and no one else was in the building at that time. When Fore arrived at Jennings's office, they began to discuss the speeding ticket Fore had issued to Butler. Unbeknownst to Jennings, Fore had a small tape recorder in the front pocket of his shirt and he tape-recorded the remainder of the conversation. The following transcript was made of the taped conversation[3]:
 "Mayor: [Butler] called me. She called me Sunday. I didn't know, I went to school with her.
"Policeman: She was a. . . .
"Mayor: Kim Wiles Butler.[4]
"Policeman: Yeah, she was . . . a Ford Explorer.
 "Mayor: I don't know what she was driving. Only she called me and she's all upset, she's got a bunch of stuff on her driving record. Says she went to Florida last year and got a ticket going down and coming back.
"Policeman: [I know one thing, I've done that.]
 "Mayor: She's had a wreck since. She's paid for her insurance. Another ticket would put her over the limit. I don't know nothing about that. She said I don't mind paying it if there's any way we could maybe get it off where it wouldn't be on my record. I don't know if that's possible or not.
"Policeman: Yeah, I'm with you.
 "Mayor: What I was thinking was this, her husband is in the paving business. I thought I might, with a little cooperation maybe call her and tell her Kim, I know you've had some problems, I ain't telling you you got to do it, but would you be willing to make a donation to our little senior citizen thing out here? $100 donation from your paving company, something like that? I don't know if that's wrong or right, I don't know.
 "Policeman: I don't know, really. I know she was upset the way she. . . .
 "Mayor: Yeah she said oh I squalled when I left. She called and talked to her mama today, and I tried to call her the other day and I had her home number, she just happened to be home this morning when I called and she said I tell you what I called mama and told her I *Page 7 
was going to try to call you one more time but mama said well don't be calling Paul, said there ain't no need to try to call him about no ticket, he can't even get his own fixed down there.
"Policeman: They-a, she-a. . . .
 "Mayor: Now what did she look like? She used to be a good looking girl. Used to be, she was the head cheerleader, and I mean she was. . . .
 "Policeman: She's still good looking. She's good looking. She really is a looker. She came around back there and be-bopping and say hey. . . .
 "Mayor: She said she'd just eat at the restaurant, Chris Eswell and them was up there and when she left she thought it was them. She said I think I startled when I got out come back to the car.[5]
 "Policeman: She started to know all this bull crap trying to tell people she knew got off around here.
 "Mayor: I think she said she asked if I was still the mayor and all this.
 "Policeman: She said she went to school with you. I don't know. I said, uh, no, uh, I'm not . . . one of them. Just go up and have a seat and then. . . . But she was doing, you know, I could understand if she was doing you know 10, 15 miles, but she was doing 24 miles over the speed limit. She was flying.
"Mayor: . . . Hayden; 63 she a, . . . .
 "Policeman: Well, I tell you what, if looks could kill, I'd still be out there on Old Springville Road.
"Mayor: She upset?
 "Policeman: Oh she was mad. When I walked up to the door, I said, [Ms. Wiles], I'm citing you for running 63 in a 40 and she turned around and looked at me, I tell you what boy, if that would have killed me it would have done killed me cause I'd have still been there. She was crying upset.
 "Mayor: She just told me she said I tell you officer, I went to Florida last year and I don't know what it was on the freeway that got me going and a coming.
"Policeman: That got me about 2 or 3 years ago.
 "Mayor: She said when I turned around and get back home, we hadn't been back long and me and my husband driving down there and somebody stops right in front of me and I rear-end them. She said I'm afraid my insurance going to end up dropping me if this gets on my record. I said oh I can't say, I said you give me a week and let me see what I can do and I'll call you back.
 "Policeman: She's a good looking thing, I wish we could work out something else.
 "Mayor: She used to be tough but . . . my cousin used to get a little of that a long time and she's good looking . . . but said you could float a battleship with. . . .[6]
 "Policeman: Hey tell her to come on by and talk to [Jane Rands].[7]
 "Mayor: She said I can't even read what his name was. I said I don't know what time it was and she said about 5:30. I said about 5:30, that may have been John. She said well listen, J.W. I can't *Page 8 
read that. That's John Wayne. OK. She said well you know if he can't . . . it ain't the money, it's just the fact that it gets on my record. She said you know we're in the paving business. I thought well it might be good to have an ally right there. Might be able to do some other work.
 "Policeman: Tell her to come on by and tell her we'll work out something (laughter).
"Mayor: Ooo, I would. I can be jealous of. . . .
 "Policeman: Well, hell, we got a bunch of empty houses up there on. . . .
 "Mayor: I'm going to be there, I might go over there tonight. Might have some company tomorrow night.
"Policeman: I'm going to have to watch you. . . .
 "Mayor: I need a little protection, watch my back, John Wayne what the problem is, it's my back that's exposed.
 "Policeman: I used to play all them games at night, when I . . . I used to have people rant and rave around town panting my name.
 "Mayor: Bad thing is I don't go out and hunt `em. Next time I find one coming that way; I'm going to tell you something, I ain't, somebody comes to my house, I mean I ain't much on married women, but if a married woman comes to my house and gives me some tail, you ain't a man if you don't take it, now. It ain't right, it ain't right to say no, you gotta go, you go on. I don't have that happen real regular but . . . you can't, I ain't never run from none, now. Ain't never had no bad, either. Had better, never had bad.[8]
 "There was another one I stopped giving a ticket to, she was doing 64, I think. She said something about Andy Garrison and she didn't say your name, she said somebody else's name. When I gave her the ticket and everything, she said I'll talk you later. I said, well, alrighty.[9] I don't Kim, I have not seen her in probably 7 or 8 years.[10]
"Policeman: She still looked good, I give you that.
 "Mayor: She did. She had a good tan, dark hair. She was on my answering machine on Sunday.
"Policeman: I missed my opportunity.
"Mayor: Yeah, your wife would beat the stew out of you now.
"Policeman: This is between. . . .
"Mayor: I'll call her and have a little chitchat with her then.
"Policeman: Alright.
"Mayor: See if I can get her to come to bed with me anyway.
"Policeman: That'd be fine too. Tell Johnny we're missing him.
"Mayor: Alright.
"Policeman: Alright.
"Mayor: We'll holler at you later.
"Policeman: OK."
Butler testified that, after the telephone conversation with Jennings, her ticket was dismissed and she knew nothing about the circumstances of the dismissal. She stated that Jennings never called her back and that she did not make any kind of payment or donation in order to get the ticket *Page 9 
dismissed. Jennings testified that he did not contact Butler about the ticket or the dismissal after their initial telephone conversation.
Officer Fore, after secretly recording the discussion between him and Jennings concerning Butler's ticket, took the tape-recording and gave it to his friend and the former police chief, Larry Leonard. Fore also met with Guy Martin, an attorney representing Leonard in his unrelated action against the Town of Argo, the members of the city council, and Jennings, and gave Martin an oral statement summarizing the content of the tape-recorded conversation with Jennings. Fore's meeting with Martin took place at the offices of a man named Bobby Smith.[11] Apparently, Smith was also pursuing an unrelated legal action against the Town of Argo, and Martin was also representing Smith.
Martin subsequently received a copy of the tape-recording; he produced the above-quoted transcript of the taped conversation. Leonard and Smith then met with Kathryn Ayres, a member of the city council of the Town of Argo.[12] Smith provided Ayres with a copy of the tape-recorded conversation between Fore and Jennings and a copy of the transcript of the tape. At some point, Ayres distributed copies of the transcript to at least two newspaper reporters — one who worked for the BirminghamNews and one who worked for the St. Clair News-Aegis.
On April 27, 1998, an article appeared in the Birmingham News
concerning the conversation between Fore and Jennings. On May 4, 1998, Ayres distributed copies to the city council during a council meeting of the transcript of that conversation, a petition calling for Jennings's resignation, and a "resolution" she had drafted ordering an investigation into the matter. The petition and the resolution suggested various wrongdoings by Butler and Jennings concerning the dismissal of Butler's ticket. On May 5, 1998, another article concerning the dismissal of Butler's ticket appeared in the Birmingham News. After a city council meeting on June 1, 1998, Ayres played the tape-recorded conversation between Jennings and Fore in a crowded parking lot outside the city hall for at least one newspaper reporter from the St. Clair News-Aegis. On June 4, 1998, an article on Butler's ticket appeared in the St. ClairNews-Aegis.
On June 1, 1998, Jennings wrote a letter and distributed copies of it to the city council and to the members of the public attending the June 1 city council meeting. The letter was later published in the St. ClairNews-Aegis and portions of the letter were published in the BirminghamNews. The letter stated, in pertinent part:
 "Although I do not recall the specifics of this February, 1997, conversation, . . . I want to make it very clear that at no time have I ever dismissed or promised to have tickets dismissed in exchange for sexual favors. I did discuss with the individual noted in the transcript about the possibility of the speeding ticket being dismissed upon a donation being made to a local civic group. However, this conversation took place after the individual, a past resident of the area, had called me and asked for my help because of long-term problems the speeding ticket could cause. I told this *Page 10 
individual, however, I did not know about the legality of such an offer. A close reading of the transcribed conversation, I believe, bears this out.
 "Furthermore, although I did only inquire with [the] Argo Police Chief about the possibility of helping this individual, at no time was the help contingent upon any donation and in fact no donation was made. . . .
". . . .
 "I do apologize to the individual discussed in the transcript and to the council and citizens of Argo[;] however, I will not resign as Mayor of the Town of Argo, Alabama."
Butler testified at trial that she and Jennings did not discuss the possibility of a donation in exchange for dismissing her ticket. Jennings also admitted at trial that he was mistaken in his statement in his letter and that such a discussion never took place. Additionally, both parties testified that Butler has never resided in Argo.
On June 17, 1998, Butler's counsel made a written demand pursuant to §6-5-186, Ala. Code 1975, that Jennings publicly retract the allegedly defamatory language contained in the transcript and the letter. It appears from the record that Jennings never responded to the written demand in any manner.
Shortly after the newspaper articles appeared, Sam Butler, Kim's husband of 16 years, telephoned Ayres. When Ayres returned Sam's call, she included Guy Martin in a three-way conference call. Ayres and Martin wanted to speak with Kim, but Sam told them not to contact Kim. Sam also told Ayres and Martin to stop spreading false information about his wife or he would hire an attorney and pursue legal action. In June or July 1998, Guy Martin telephoned Kim at work and attempted to "get some dirt on Mayor Jennings." When Butler refused to disparage Jennings, Martin inquired whether Jennings had acted toward her in a manner consistent with the suggestions he had made in the conversation with Fore. Butler told Martin that none of the things Jennings mentioned in the transcript had occurred.
The exhibits introduced at trial indicate that between April 27, 1998, and August 22, 1998, at least 10 articles concerning Butler and Jennings appeared in the Birmingham News, the Dothan Eagle, the Gadsden Times, and the St. Clair News-Aegis. Kim Butler testified that although she does not live in the Town of Argo, everyone she saw would ask her about the situation with Jennings. She stated that friends from as far away as Ozark, Alabama, knew about what had happened and what had been said about her. Kim Butler's husband, her sister-in-law, and her mother testified that, although they do not live in Argo, they are constantly asked by people who live in various parts of the state about the situation between Jennings and Butler. Butler stated that as a result of all of the unwanted publicity caused by statements that were not true, she lost sleep and she was unable to eat. She has been constantly nauseated, suffers from diarrhea, and has lost approximately 25 pounds. She further testified that she has had to take medication in order to be able to eat and to sleep.
Butler also testified that when the transcript was being passed around the community and the newspaper articles were being published, she had to assure her husband that nothing that Jennings had said about her past or about the dismissal of the ticket had occurred. Although the Butlers had tried to shield their children from the statements surrounding the dismissal of the ticket, Butler testified that her 10-year-old son read one of the newspaper articles about her at school. This *Page 11 
particular article specifically quoted Jennings's statement about trying to get Butler "to [go] to bed" with him. Kim said that her son could not bring himself to ask her about it and would discuss the article only with her husband Sam. Sam said that the day their son came home and asked about the article he had read in the newspaper was one of the most difficult days of the ordeal. Butler testified that all of the gossip and publicity about things that were not true made her feel like a "bad" woman in her children's eyes and like she was not the kind of wife and mother that she had always tried to be.
On August 13, 1998, Kim Butler sued Jennings, alleging slander and defamation, negligent infliction of emotional distress, and invasion of privacy/false light. Butler later amended her complaint to state a claim alleging negligence and to add John Wayne Fore, Kathryn Ayres, and the Town of Argo as defendants in the action.[13] The case was tried before a jury, and the trial court charged the jury as to defamation, including libel and slander, and invasion of privacy. On April 12, 2001, the jury returned a general verdict in favor of Butler and against Jennings, Fore, Ayres, and the Town of Argo. The jury assessed compensatory damages in the amount of $375,000 against Jennings, Fore, and Ayres. The jury assessed only nominal damages against the Town of Argo but assessed punitive damages in the amount of $125,000 against Ayres. Costs were taxed against the defendants.
Jennings, Fore, and Ayres filed various posttrial motions, and on August 1, 2001, the trial court issued an order purporting to remit the damages awarded by the jury and to apportion them. On August 21, 2001, Butler filed a notice of acceptance of the remittitur, reserving her right to seek reinstatement of the full verdict on appeal should any of the defendants appeal the court's judgment. Jennings, Fore, and Ayres appeal from the judgment against them, and Butler appeals, seeking reinstatement of the full verdict.
 I. Jennings v. Butler (case no. 1002162) A.
Paul Jennings contends that the trial court erroneously denied his motion for a judgment as a matter of law ("JML") as to Butler's invasion-of-privacy claim against him. Specifically, Jennings contends that the trial court should have entered a JML as to this claim because, he says, Butler failed to produce substantial evidence indicating that Jennings ever publicly communicated private or untrue information about her. We agree.
 "'[T]his Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in *Page 12 
the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126
(Ala. 1992).
 "'Furthermore, a jury verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of a motion for a new trial. Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala. 1992). In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party, and it will set aside the verdict only if it is plainly and palpably wrong. Id.'
 "Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31
(Ala. 1999)."
I.C.U. Investigations, Inc. v. Jones, 780 So.2d 685, 688 (Ala. 2000).
Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy. SeeI.C.U. Investigations, Inc. v. Jones, 780 So.2d at 688; Johnston v. Fuller,706 So.2d 700, 701 (Ala. 1997); Smith v. Doss, 251 Ala. 250, 37 So.2d 118
(1948). "`This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.'" Rosen v. Montgomery Surgical Ctr.,825 So.2d 735, 737 (Ala. 2001) (quoting Carter v. Innisfree Hotel, Inc.,661 So.2d 1174, 1178 (Ala. 1995)).
 "It is generally accepted that invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use. Norris v. Moskin Stores, Inc., 272 Ala. 174, 132 So.2d 321 (1961)."
Johnston, 706 So.2d at 701.
Butler claims that Jennings invaded her privacy by placing her in a false position in the public eye. Applying Restatement (Second) of Torts
§ 652E (1977) and the following comments, this Court has adopted the following definition for "false light" invasion of privacy:
 "'One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
 "'(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
 "'(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'"
Schifano v. Greene County Greyhound Park, Inc., 624 So.2d 178, 180 (Ala. 1993) (emphasis omitted) (quoting Restatement (Second) of Torts § 652E (1977)). A false-light claim does not require that the information made public be private; instead, the information made public must be false. SeeRestatement (Second) of Torts § 652E cmt. a. (1977).
Additionally, it is integral to a false-light claim that the untrue information be publicly communicated. Comment a. to § 652E states, "The rule stated here is, however, limited to the situation in which the plaintiff is given publicity. On what *Page 13 
constitutes publicity and the publicity of application to a simple disclosure, see § 652D, Comment a., which is applicable to the rule stated here."
Comment a. to § 652D states:
 "'Publicity,' as it is used in this Section, differs from `publication,' as that term is used in § 577 in connection with liability for defamation. `Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person. `Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
 "Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication."
See Rosen v. Montgomery Surgical Ctr., 825 So.2d at 739; Johnston v.Fuller, 706 So.2d at 703; Ex parte Birmingham News, Inc., 778 So.2d 814,818 (Ala. 2000).
Butler claims that Jennings publicly placed her in a false light when he (1) conversed with Fore and other individuals about matters concerning her, (2) received a copy of the above-quoted transcript and other materials into the minutes at a city council meeting, (3) distributed a letter in which he stated that he and Butler had discussed the possibility of dismissing her ticket in exchange for a donation by her, and (4) gave an interview to a reporter from the Birmingham News. Because of the detailed nature of each of Butler's allegations, we will review each claim individually.
 1.
Butler asserts that Jennings placed her in a false position in the public eye when he made untrue statements about her to various individuals. Specifically, Butler alleges that Jennings disseminated false information about her to Fore; to the police chief of Argo, Norman Watson; and to various individuals in the clerk's office of the city hall. Each of those allegations, however, fails to rise to the level of invasion of privacy by false light because Jennings did not give publicity to the information as that term is defined by Alabama law.
In Rosen, 825 So.2d at 735, the plaintiff Rosen brought an invasion-of-privacy claim against the Montgomery Surgical Center and others (referred to collectively as "the MSC defendants") for wrongfully informing one of Rosen's coworkers of a surgical procedure she had undergone at the Center. Rosen's coworker then told two more coworkers of Rosen's medical procedure. Quoting extensively from Restatement (Second)of Torts § 652D cmt. a. (1977), this Court determined that the MSC defendants did not communicate the matter of Rosen's surgery to so many people that it was "`substantially certain to become one of public knowledge.'" 825 So.2d at 739 (quoting Restatement(Second) of Torts § 652D cmt. a. (1977)). In fact, at the very most, the MSC defendants communicated the information to one person, who, *Page 14 
in turn, communicated it to two more people. Because Rosen failed to produce substantial evidence indicating that the MSC defendants had widely disseminated the information about her, we held that Rosen could not try her invasion-of-privacy claim to a jury. See also Ex parte BirminghamNews, Inc., 778 So.2d at 814 (holding that the plaintiff failed to produce substantial evidence of publicity when her employer communicated information about her to one other person in addition to the plaintiff, and other coworkers were told only pursuant to an investigation into the matter).
In this case, Butler alleges that Jennings gave publicity to false information about her by discussing that information with Fore, Chief Watson, and a few unnamed individuals in the clerk's office.[14] Like the MSC defendants in Rosen, supra, Jennings's communications in these instances were not of such a nature that would make the matter "substantially certain to become one of public knowledge."Restatement(Second) of Torts § 652D cmt. a. (1977). Jennings's discussion of matters with two police officers and a few city employees was not the widespread dissemination required to support Butler's allegations that Jennings gave publicity to information about her that placed her in a false light in the public eye. Thus, Jennings's comments about Butler to just a few city employees does not constitute a communication that reaches, or is sure to reach, the public.
 2.
Butler contends that Jennings placed her in a false light in the public eye when he received a copy of the transcript, a copy of a petition, and Ayres's "resolution" into the minutes of the city council meeting on May 4, 1998, upon Ayres's submission of the materials to the city council. Specifically, Butler argues that although Ayres introduced, discussed, and submitted the transcript, petition, and resolution, those documents became matters of public record only after Jennings received them and a clerk stamped and signed them, making them part of the official minutes of the meeting. Thus, according to Butler, Jennings's actions gave the required publicity to the materials to make them substantially certain to become matters of public knowledge.
Jennings argues that his mere receipt of the materials during the meeting does not constitute an intentional communication to the public. While Butler contends that Jennings should have refused to receive Ayres's submissions or that he should have redacted certain portions of the materials before handing them to the clerk, Jennings claims that, at city council meetings, he receives materials submitted by council members without exercising any discretion as to what is accepted and without the option to redact any portion of the submissions. The materials would then be stamped and signed by a clerk and would become part of the official minutes of the city council meeting.
We note that Butler has failed to provide any legal authority to support her argument that Jennings's act of receiving documents handed to him by Ayres constituted an intentional communication to the public. Furthermore, the parties have given this Court no framework or authority on which to evaluate Jennings's actions. It is not clear exactly when Ayres's materials became a part of the public record and whether Jennings's actions even contributed to the materials' becoming a part of the public record. Neither party has *Page 15 
explained whether the materials were made part of the public record when Ayres read them aloud at the city council meeting, when she submitted them to become part of the minutes, when Jennings received the materials, when he handed the materials to the city clerk, or when the clerk stamped and signed them. Butler, in focusing on the public aspect of the record of the actions of the city council, fails to provide us with any legal basis from which one could conclude that the mere administrative act of receiving materials — submitted by someone else — which later become the official minutes of a city council meeting constitutes an intentional communication of information to the public by the person receiving the documents.[15] It appears that Jennings passively received materials handed to him by Ayres. Although those materials ultimately became a part of the public record, we cannot conclude, as argued by Butler, that Jennings's actions gave publicity to the materials. Therefore, Butler has failed to demonstrate that Jennings actually communicated false information about her during the city council meetings.
 3.
Butler argues that Jennings portrayed her in a false light in the public eye when he wrote and disseminated his June 1, 1998, letter. Specifically, Butler alleges that in the letter Jennings falsely stated that he and Butler had discussed the possibility of her making a donation to a civic group in exchange for his getting her ticket dismissed. Jennings distributed the letter to the city council, to every person in attendance at the city council meeting, and to newspaper reporters for the Birmingham News and the St. Clair News-Aegis. The letter and portions of the letter were then published in the two newspapers.
It is undisputed that the letter was widely disseminated. It is also undisputed that Butler and Jennings did not discuss dismissing the ticket in exchange for a donation. Instead, Butler told Jennings that she was willing to pay the ticket but that she did not want the fact that she had gotten a ticket to be revealed to her insurance company, if possible. Butler claims that Jennings's assertion in his letter that they discussed the possibility of her making a donation to a local civic group in exchange for a dismissal of the ticket places her in a false light in the public eye because the statement is "defamatory." Although it is undisputed that the statement was false, Butler fails to explain how this particular mistaken comment could be "`highly offensive' to a reasonable person," as required for a false-light claim. Schifano v. Greene CountyGreyhound Park, Inc., 624 So.2d at 180. Jennings's letter does not impute any wrongdoing to Butler, and, when the letter is read in its full context, it is clear that Butler gave nothing in exchange for the dismissal of the ticket.[16] Because Butler has failed to *Page 16 
demonstrate that Jennings's statement was capable of being highly offensive to a reasonable person, her false-light claim must fail as to this allegation.
 4.
Butler contends that Jennings placed her in a false light in the public eye when he discussed false information about her with a reporter from the Birmingham News. Although Jennings admits in his testimony that he received many telephone calls from the newspaper reporter, there is no indication in the record as to when the calls took place, and there is absolutely no information in the record as to what was said during the conversations. This scant information falls far short of the substantial evidence needed to create an issue of fact for the fact-finder to resolve as to this allegation.
Because Butler has failed to produce substantial evidence as to each of her allegations of false light against Jennings, the trial court should have entered a JML for Jennings as to Butler's false-light claim.
 B.
Jennings argues that the trial court should have granted his motion for a JML as to Butler's defamation claims against him. Specifically, Jennings contends that Butler failed to produce substantial evidence to support a claim of slander per se or slander per quod, and that she failed to produce substantial evidence to support her libel claim.
 "To establish a prima facie case of defamation, the plaintiff must show that the defendant was at least negligent, see Mead Corp. v. Hicks, 448 So.2d 308
(Ala. 1983); Restatement (Second) of Torts § 558, § 580B (1977), in publishing a false and defamatory statement to another concerning the plaintiff, Restatement (Second) of Torts § 558, which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod). Restatement (Second) of Torts § 558; see also Albert Miller Co. v. Corte, 107 F.2d 432 (5th Cir. 1939), cert. denied, Corte v. Albert Miller Co., 309 U.S. 688, 60 S.Ct. 890, 84 L.Ed. 1031 (1940)."
Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1091 (Ala. 1988) (footnote omitted).
 "'The foundation of an action for libel or slander is a malicious injury to reputation, and any false and malicious imputation of crime or moral delinquency by one published of and concerning another, which subjects the person to disgrace, ridicule, odium, or contempt in the estimation of his friends and acquaintances, or the public, with resulting damage to his reputation, is actionable either per se or per quod. . . .
 "'There is a distinction between actions of libel predicated on written or printed malicious aspersions of character, and actions of slander resting on oral defamation. . . . This distinction, however, is merely in respect to the question as to whether the imputed language or words are actionable per se.
 "'In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se. While to constitute slander actionable per se, *Page 17 
there must be an imputation of an indictable offense involving infamy or moral turpitude. . . .
 "'This distinction, however, does not deny the right to maintain an action for slander founded on oral malicious defamation subjecting the plaintiff to disgrace, ridicule, odium, or contempt, though it falls short of imputing the commission of such crime or misdemeanor. In such case the law pronounces the words actionable per quod only, and the plaintiff must allege and prove special damages as an element of the cause of action.'"
Ceravolo v. Brown, 364 So.2d 1155, 1156-57 (Ala. 1978) (quoting Marionv. Davis, 217 Ala. 16, 18, 114 So.2d 357, 358-59 (1927)).
 1.
Jennings claims that Butler failed to produce substantial evidence demonstrating that his statements about her constituted slander per se. In response, Butler argues that Jennings's statements impugned her chastity and implied that she was willing to engage in various wrongdoings to have a traffic ticket dismissed. In support of her argument that Jennings's statements constituted slander per se, Butler relies upon § 6-5-181, Ala. Code 1975. Section 6-5-181, Ala. Code 1975, provides: "Any words written, spoken, or printed of any woman falsely imputing to her a want of chastity are actionable without proof of special damages." However, this Court has already disapproved identical language contained in § 13A-11-163, Ala. Code 1975:
 "However, the first portion of [§ 13A-11-163, Ala. Code 1975], imposing criminal liability on '[a]ny person who writes, prints or speaks of and concerning any woman, falsely imputing to her a want of chastity,' was, without question, unconstitutional when the Legislature reenacted the statute in 1980. See Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306
(1979) (declaring unconstitutional an Alabama statute authorizing a court to impose an alimony obligation on a husband but not on a wife). The fact that in reenacting the criminal-defamation statute the Legislature retained this unconstitutional gender-based provision rebuts any presumption that the Legislature intended to comply with United States Supreme Court precedents. . . ."
Ivey v. State, 821 So.2d 937, 945 (Ala. 2001) (footnote omitted). The language in § 6-5-181 is identical to the language in § 13A-11-163
declared unconstitutional by this Court. Therefore, pursuant to Orr v.Orr, supra, and Ivey v. State, supra, the language in § 6-5-181 relied upon by Butler is unconstitutional and cannot support her claim.
Thus, as set out above in Ceravolo, supra, in order to demonstrate that Jennings's statements were actionable as slander per se, his statements must impute to Butler an indictable offense involving infamy or moral turpitude.
 "When determining whether a statement is actionable as slander per se, a court must give the language used `that meaning that would be ascribed to the language by a reader or listener of "average or ordinary intelligence, or by a common mind."' Camp v. Yeager, 601 So.2d 924, 927 (Ala. 1992), quoting Loveless v. Graddick, 295 Ala. 142, 148, 325 So.2d 137, 142
(1975). . . . [T]he alleged slanderous statement must be construed in connection with the other parts of the conversation, in order to determine the context in which the statement was made."
Liberty Nat'l Life Ins. Co. v. Daugherty, [Ms. 1010751, July 12, 2002] 840 So.2d 152, 157-58 (Ala. 2002). *Page 18 
In Anderton v. Gentry, 577 So.2d 1261 (Ala. 1991), Gentry, the president of a bank, told various customers and others that Anderton, an employee of the bank, had approved loans for certain people in exchange for sexual favors. Anderton denied the allegations and sued Gentry, alleging slander. Anderton specifically argued that Gentry's statements about him constituted slander per se because, he argued, the statements charged him with adultery and with soliciting prostitution. This Court, however, noted that Gentry's statements about Anderton did not describe the actions defined as adultery in § 13A-13-2, Ala. Code 1975, or as prostitution in § 13A-12-110, Ala. Code 1975. Thus, because Gentry's statements did not suggest a crime of infamy or moral turpitude, we held that the statements could, at most, support a claim of slander per quod.
The only evidence Butler argues in her brief as support for her slander claim against Jennings is the above-quoted transcript of Jennings's recorded conversation with Fore. Construing Jennings's statements from the transcript in light of their ordinary meaning and in the context of the entire conversation, we conclude that Jennings has not attributed to Butler an indictable offense suggesting infamy or moral turpitude. Furthermore, although Butler makes the conclusory assertion that, at some point, Jennings implied that she had participated in a crime, she does not explain or describe exactly what indictable offense she believes Jennings has imputed to her.[17] While some of Jennings's comments about hisown behavior and intentions could be construed as questionable, he does not impute an indictable offense of any sort to Butler. Therefore, Butler has failed to produce substantial evidence of slander per se.
Butler next argues that she has produced substantial evidence to support a claim for slander per quod because, she argues, even if Jennings's statements do not imply that she committed a crime, his statements still expose her to disgrace, ridicule, and contempt. However, in order to support her claim of slander per quod, Butler must not only demonstrate that Jennings's statements subjected her to ridicule and contempt, she must also plead and prove that she suffered special damage as an element of the cause of action. See Daugherty, 840 So.2d at 157; Anderton, 577 So.2d at 1264; Rule 9(g), Ala.R.Civ.P.
 "Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, see Harrison v. Burger, 212 Ala. 670, 103 So. 842, 844 (1925), and the general rule is that they are limited to `material loss capable of being measured in money,' Restatement 2d of Torts § 575, cmt. b, at 198."
Shook v. St. Bede School, 74 F. Supp.2d 1172, 1180 (M.D.Ala. 1999). Absent the required pleading and proving of special damage, Butler's allegation that Jennings's statements about her subjected her to public ridicule or even contempt is insufficient to support a claim of slander per quod.
 "While it may be odious to berate someone in public with threats and ethnic slurs and to attack someone with epithets such as `dead beat' and `crook,' such questionable behavior is, nevertheless, not actionable in Alabama absent allegations of special damages. Even under our liberalized rules of procedure, Rule 9(g) [, Ala.R.Civ.P.,] still requires special damages to be specifically stated, and without them [a] complaint does not *Page 19 
state a claim upon which relief can be granted."
Ceravolo, 364 So.2d at 1157.
Butler's complaint does not specifically allege special damage, either as an element of her slander claim or otherwise. Furthermore, Butler failed to produce substantial evidence of special damage at trial. Although there was abundant evidence that Butler suffered mentally and emotionally as a result of the untrue statements about her, there was no evidence of a "`material loss capable of being measured in money.'" Shookv. St. Bede School, 74 F. Supp.2d at 1180 (quoting Restatement (Second)of Torts, § 575 cmt. b. (1977)). Because Butler failed to produce substantial evidence of special damage — a material element of her slander per quod claim — the trial court should have granted Jennings's motion for a JML as to this issue.
 2.
Butler maintains that she presented substantial evidence in support of her libel claim against Jennings. First, Butler argues that Jennings published libelous material about her when he widely distributed his June 1 letter, in which he incorrectly recalled various facts concerning their conversation about the speeding ticket. Jennings, however, contends that none of his statements in the June 1 letter could possibly be construed as defamatory to Butler.
"Whether a communication is reasonably capable of a defamatory meaning is a question of law." Kelly v. Arrington, 624 So.2d 546,548 (Ala. 1993).
 "'Generally, any false and malicious publication, when expressed in printing or writing, or by signs or pictures, is a libel [if it] . . . charges an offense punishable by indictment or . . . tends to bring an individual into public hatred, contempt or ridicule or charges an act odious and disgraceful in society.'"
Drill Parts Serv. Co. v. Joy Mfg. Co., 619 So.2d 1280, 1289 (Ala. 1993) (quoting McGraw v. Thomason, 265 Ala. 635, 639, 93 So.2d 741, 744
(1957)).
Butler alleges that Jennings's statement that he and Butler discussed the possibility of his having her speeding ticket dismissed in exchange for her making a donation to a civic group was defamatory. Although it is undisputed that Jennings's statement was false, his claim that he and Butler discussed the possibility of dismissing the ticket in exchange for a donation to a local civic group does not impute to Butler an indictable offense, and Butler does not allege that it does. Furthermore, it is not readily apparent from a reading of the letter how Jennings's mistaken recollection of their conversation could bring Butler into "public hatred, contempt or ridicule," nor does the letter charge Butler with an act that is disgraceful to society. Jennings's statement, as it would be understood by an average reader, does not impute any negative behavior to Butler, other than the fact that she was speeding. In fact, when read in its full context, Jennings's letter clearly states that Butler's ticket was not dismissed in exchange for anything. Butler does not explain how Jennings's statements in his letter could possibly be interpreted as being defamatory toward her. Because Butler has failed to show that Jennings's statement could be capable of a defamatory meaning, the trial court should have granted Jennings's motion for a JML as to this claim.
Butler also argued at trial that Jennings published libelous materials against her when he received the transcript, the petition, and the resolution from Ayres at the city council meeting. Butler asserts that because of Jennings's actions — receiving the materials that were subsequently *Page 20 
stamped and signed by the city clerk — the materials officially became part of the minutes of the city council meeting and thus became matters of public record.
Jennings argues that, as a matter of law, his action of merely accepting documents submitted by Ayres does not amount to a publication. We note that Butler provides us with absolutely no legal basis on which to hold that Jennings's actions constituted a "publication." Butler argues that Jennings should have refused to receive Ayres's submissions or that he should have redacted the defamatory portions of Ayres's materials before handing the materials over to the clerk. Jennings, however, argues that at city council meetings he receives documents without having the discretion to refuse them or to edit them. In this case, he simply handed the materials to the clerk to be stamped and signed as received into the minutes. This, Jennings claims, does not amount to a publication of the materials by him.[18]
There is no legal basis to support Butler's allegations that Jennings's receipt of materials submitted to the council by Ayres constitutes a publication of the materials by Jennings. Neither party has provided us with any source for the rules and conduct of the city council meetings of the Town of Argo, and we have no framework from which to evaluate Ayres's, Jennings's, and the clerk's actions at those meetings. Furthermore, Butler did not explain at trial, nor does she explain in her brief on appeal, exactly when a publication of the materials occurred — i.e., did the publication occur when Ayres read the materials aloud at the city council meeting, when Ayres submitted them to Jennings to become part of the minutes, when Jennings physically received the materials submitted by Ayres, when Jennings handed the materials to the city clerk, or when the city clerk stamped and signed the materials? Additionally, it is unclear from Butler's arguments exactly when the materials officially became a part of the city council meeting minutes and thus public record.
In order for Butler to prove a libel claim against Jennings, she must demonstrate more than his mere physical receipt of documents handed to him by Ayres at the city council meeting. See Runnels v. Okamoto,56 Haw. 1, 525 P.2d 1125 (1974) (plaintiff alleging libel against city council members must show more than a physical receipt of materials to prove publication, even if the members accepted the allegations contained in the materials as true). Furthermore, "it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." Dykes v. Lane Trucking,Inc., 652 So.2d 248, 251 (Ala. 1994) (citing Spradlin v. Spradlin,601 So.2d 76 (Ala. 1992)). Because Butler failed to provide a legal basis from which a jury could conclude that Jennings's actions during the city council meetings constituted a publication of libelous materials, the trial court should have granted Jennings's motion for JML as to this issue.
 C.
Finally, Jennings argues that the trial court erred in charging the jury on a separate count of negligence. The record, however, shows that the trial court did not charge the jury as to a separate negligence *Page 21 
claim; instead, the court instructed the jury that a defamatory statement could be published either intentionally or negligently. The court then defined negligence for the jury. The trial court's instructions as to this issue were correct statements of law. See Larrimore v. Dubose,827 So.2d 60, 61 (Ala. 2001) (quoting Nelson v. Lapeyrouse Grain Corp.,534 So.2d 1085, 1091 (Ala. 1988))("'[t]o establish a prima facie case of defamation, the plaintiff must show that the defendant was at least negligent . . . in publishing a false and defamatory statement to another concerning the plaintiff'"). Therefore, because no separate negligence claim was submitted to the jury, we need not address this issue further.[19]
 II. Fore v. Butler (case no. 1002164) A.
Fore argues that the trial court erroneously denied his motion for a JML as to Butler's invasion-of-privacy claim against him. Specifically, Fore maintains that he did not place Butler in a false light in the public eye because, he says, he did not widely disseminate false information about her. Butler responds by arguing that Fore publicly placed her in a false light by discussing allegedly false statements about her with Bobby Smith, Guy Martin, Chief Watson, and with a police officer from the Springville Police Department.[20] Butler further contends that Fore placed her in a false light in the public eye by giving to Larry Leonard a copy of the tape-recorded conversation between Fore and Jennings and by giving an interview to a reporter from the BirminghamNews.
Applying the standard of review and the law governing the tort of invasion of privacy by false light as set out in Part I.A. of this opinion, we conclude that Butler failed to produce substantial evidence as to her false-light claim against Fore. Butler alleges that Fore communicated false information about her to four individuals and that he gave a copy of his tape-recorded conversation with Jennings to Larry Leonard. However, Fore's alleged communication of false information to five people, without more, cannot serve as the basis for a false-light claim. See Restatement (Second) of Torts § 652D cmt. a. (1977) ("[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.") Like the plaintiff in Rosen, 825 So.2d at 735, Fore, at most, communicated information to a few people, who, in turn, may have communicated the information to a few more people.[21] See Part I.A.1. Butler's allegations that Fore discussed matters with a few individuals is not a communication "to so many persons that the matter must be regarded as substantially certain to *Page 22 
become one of public knowledge." See Restatement (Second) of Torts § 652D cmt. a. (1977). Because Butler failed to show that Fore made a public communication of false information about her, the trial court erred in denying Fore's motion for a JML as to this claim.
Butler further alleges that Fore gave publicity to false information about her when he gave an interview to a reporter from the BirminghamNews. At trial, Fore admitted that he spoke with a reporter from theBirmingham News on two occasions. The first occasion was shortly before the first article about Butler and Jennings appeared. Fore gave a statement to a reporter from the Birmingham News, affirming that he had listened to the tape recording of the conversation with Jennings and affirming that the conversation with Jennings had actually occurred. Fore further admitted that he gave an interview to a reporter from theBirmingham News after several other articles regarding the dismissal of Butler's ticket had been published in various newspapers. However, Fore did not testify as to the content of the interview.
Butler has failed to produce substantial evidence showing that Fore's statements to the reporter meet the elements of a false-light claim. Fore's admission to the reporter that he had listened to the tape recording and his acknowledgment that the conversation had occurred does not constitute a dissemination of false information about Butler. Furthermore, there is absolutely no evidence in the record concerning Fore's interview with the news reporter. There is no evidence explaining when the interview took place and there is no indication as to what Fore said to the reporter. Therefore, there is no evidence from which one could determine whether Fore communicated false information about Butler to the news reporter during the interview. Because Butler failed to produce substantial evidence demonstrating that Fore communicated false information about her to the news reporter from the Birmingham News, the trial court should have granted Fore's motion for a JML as to this claim.
 B.
Fore argues that the trial court erroneously denied his motion for a JML as to Butler's slander claim against him.[22] Analyzing Butler's claims in light of the law set out in Part I.B., we conclude that Butler has failed to produce substantial evidence as to the elements of her slander claim against Fore. As discussed above, for Butler to prove a claim of slander per se, she must produce substantial evidence indicating that Fore published slanderous statements about her that impute to her an indictable offense involving infamy or moral turpitude. See Ceravolo v.Brown, 364 So.2d at 1156-57. However, Butler fails to specify any defamatory statements Fore made about her. In her brief to this Court, Butler asserts that Fore's statements during his conversation with Jennings, such as "She's a good looking thing, I wish we could work out something else," "Tell her to come on by and tell her we'll work out something (laughter)," and "I missed my opportunity," are "defamatory." While these statements, along with the others in the transcript, are certainly boorish, they do not imply that Butler has committed an indictable offense. In fact, Fore's statements do not impute any negative behavior to Butler; instead, they reflect what could be considered Fore's own *Page 23 
questionable behavior and intentions. Butler has not alleged that Fore has published statements that imply that she has engaged in an indictable offense of any kind, nor is there any evidence in the record that would support such an allegation. Therefore, Butler's allegation of slander per se against Fore must fail.
For Butler to support a claim of slander per quod, she must plead and prove that she suffered special damages as a result of Fore's alleged publication of slanderous statements against her. See Daugherty, 840 So.2d at 157. As discussed in Part I.B.1., Butler failed to plead and prove special damages as to this claim. Therefore, because Butler has failed to produce substantial evidence as to her slander per se and slander per quod claims against Fore, the trial court should have granted Fore's motion for a JML as to this issue.[23]
 III. Ayres v. Butler (case no. 1002163) A.
Ayres contends that the trial court erred in denying her motion for a JML as to all of Butler's claims against her because, Ayres maintains, she is entitled to an absolute legislative privilege for all of her actions. Butler argues, however, that although some of Ayres's actions during the city council meetings may be privileged, Ayres is not entitled to a legislative privilege for any actions that took place outside of the meetings, nor is she entitled to the privilege for publications made during city council meetings that were not related to matters of public concern.
"As one court has stated, `the availability of an absolute privilege must be reserved for those situations where the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a defendant's motives.'" Webster v. Byrd,494 So.2d 31, 35 (Ala. 1986) (quoting Supry v. Bolduc, 112 N.H. 274,276, 293 A.2d 767, 769 (1972)).
 "'An absolutely privileged communication is one in respect of which, by reason of the occasion on which, or the matter in reference to which, it is made, no remedy can be had in a civil action, however hard it may bear upon a person who claims to be injured thereby, and even though it may have been made maliciously, and is false. To make the defense of absolute privilege available, the communication must be made on a privileged occasion; the circumstances under which the defamatory language is used are the occasion, and it is the occasion that is privileged. The privilege is a matter of public policy, and is not intended so much for the protection of those engaged in the public service and in the enactment and administration of law, as for the promotion of the public welfare, the purpose being that members of the legislature, judges of courts, jurors, lawyers, and witnesses may speak their minds freely and exercise their respective functions without incurring the risk of a criminal prosecution or an action for the recovery of damages.'"
O'Barr v. Feist, 292 Ala. 440, 445, 296 So.2d 152, 156 (1974) (quoting 50 Am.Jur.2d Libel and Slander § 193, p. 696).
In order to promote the public welfare, Alabama law has conferred upon members of legislative bodies an absolute privilege from certain causes of action stemming from the performance of their legislative functions.Webster v. Byrd, supra. See also Ala. Const. 1901, art. IV, § 56 ("Members of the legislature . . . for *Page 24 
any speech or debate in either house shall not be questioned in any other place.").
 "In defamation actions, the only absolutely privileged communications recognized under the law are those made during legislative or judicial proceedings . . . or contained in legislative acts of this state which are made under authority of law. O'Barr v. Feist, 292 Ala. 440, 445, 296 So.2d 152, 156 (1974); Tonsmeire v. Tonsmeire, 281 Ala. 102, 106, 199 So.2d 645, 648 (1967); Browning v. Birmingham News, 348 So.2d 455, 458 (Ala. 1977); Mead Corporation v. Hicks, 448 So.2d 308, 313 (Ala. 1983). It is equally well-established that whether the communication was privileged or not by reason of its character, or the occasion on which it was made, is a question of law to be decided by the court. O'Barr v. Feist, supra, Kenney v. Gurley, 208 Ala. 623, 627, 95 So. 34, 38 (1923); Interstate Electric Co. v. Daniel, 227 Ala. 609, 613, 151 So. 463, 466 (1933)."
Walker v. Majors, 496 So.2d 726, 730 (Ala. 1986).
This privilege has been extended to members of local legislative bodies, such as a city council. "A member of the Congress of the United States or of a State or local legislative body is absolutely privileged to publish defamatory matter concerning another in the performance of his legislative functions." Restatement (Second) of Torts, § 590 (1977). Thus, members of local legislative bodies, i.e., city council members, are absolutely privileged to publish matters concerning others if the publication is made during the performance of the members' legislative duties. See id. Unlike the privilege afforded to those involved in judicial proceedings, the legislative privilege applies even when the defamatory communication is not related to matters of public or legislative concern. See Restatement (Second) of Torts, § 590 cmt. a. (1977). The privilege, however, does not extend to public discussion outside of a legislative function, such as explaining reasons for voting on legislation or engaging in activities only incidentally related to legislative affairs. See Restatement (Second) of Torts, § 590 cmt. a. Furthermore, although this absolute privilege is rooted in defamation law, the privilege also applies to the publication of any matter that amounts to an invasion of privacy. See Restatement (Second) of Torts § 652F (1977).
Butler claims that Ayres widely disseminated false information about her and defamed her by circulating a petition among the citizens of Argo; by presenting a copy of the petition, the transcript of Jennings's and Fore's tape-recorded statements, and a "resolution" written by Ayres to council members at the city council meeting; by talking to and receiving telephone calls from numerous people in the town regarding this matter; by playing the tape-recorded conversation between Fore and Jennings for a news reporter from the St. Clair News-Aegis; by distributing copies of the transcript of the conversation to a news reporter from the Birmingham News and to a reporter from the St. ClairNews-Aegis; and by giving interviews to two newspaper reporters.
Analyzing Butler's allegations against Ayres in light of the law concerning absolute legislative privilege as set out above, we hold that Ayres's actions are absolutely privileged as to Butler's invasion-of-privacy and defamation claims insofar as they concern Ayres's introduction and submission of the petition, the transcript, and the resolution during the city council meeting. It is undisputed that Ayres disseminated these materials to each council member, discussed the allegations contained in the materials in a roomful of spectators, and *Page 25 
submitted the materials to be made part of the minutes of the meeting, thus ultimately making them public records. However, Ayres's actions were performed in conjunction with her recommendation to the city council that Mayor Jennings be asked to resign, or, in the alternative, that the council begin an investigation into Jennings's activities concerning the dismissal of traffic tickets. Any publication of these allegedly false and defamatory materials occurred pursuant to Ayres's performance of a legislative function. Therefore, despite the falsity of any statements she made and despite any malice she may have had in making them, Ayres is absolutely privileged from Butler's claims as to publications Ayres made during the city council meeting. However, Ayres's other alleged publications — circulating a petition, talking with numerous people, playing the tape-recorded conversation between Jennings and Fore for a reporter, distributing the transcript to reporters, and granting interviews to reporters — were not a part of the legislative process itself, and were, at most, only incidentally related to her legislative activities; those publications, therefore, do not fall under the absolute legislative privilege, but may still not be actionable if they fall within a qualified privilege.
 B.
Ayres further argues that those of her actions that do not fall under an absolute privilege are conditionally privileged. In order for Ayres to establish the affirmative defense of a qualified privilege,[24] she must demonstrate that her communications fit within the following parameters:
 "'"Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged. . . . The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is . . . moral in its nature. . . ."'
 "Berry v. City of New York Ins. Co., 210 Ala. 369, 371, 98 So. 290 (1923). See also Clark v. America's First Credit Union, 585 So.2d 1367, 1370 (Ala. 1991); Gore v. Health-Tex, Inc., 567 So.2d 1307, 1308 (Ala. 1990); Atkins Ford Sales, Inc. v. Royster, 560 So.2d 197, 200 (Ala. 1990); Reynolds Metals Co. v. Mays, 547 So.2d 518, 524 (Ala. 1989); Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085 at 1094 (Ala. 1988); Kirby v. Williamson Oil Co., 510 So.2d 176, 179 (Ala. 1987); Tidwell v. Winn-Dixie, Inc., 502 So.2d 747, 748
(Ala. 1987); WKRG-TV, Inc. v. Wiley, 495 So.2d 617, 619 (Ala. 1986); Webster v. Byrd, 494 So.2d 31, 36
(Ala. 1986); Montgomery v. Big B, Inc., 460 So.2d 1286, 1288 (Ala. 1984); Mead Corp. v. Hicks, 448 So.2d 308, 312 (Ala. 1983); Fulton v. Advertiser Co., 388 So.2d 533, 537 (Ala. 1980); Browning v. Birmingham News, 348 So.2d 455, 458 (Ala. 1977); Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120 (Ala. 1976).
 "'Where the defendant acted in the discharge of any public or private duty, whether legal or moral, which the ordinary exigencies of society, or *Page 26 
his own private interest, or even that of another, called upon him to perform, the law simply . . . gives protection to the defendant. . . .'
 "[Alabama Pattern Jury Instructions: Civil] 23.12 (2d ed. 1993)."
Ex parte Blue Cross Blue Shield of Alabama, 773 So.2d 475, 478-79
(Ala. 2000). "Whether a statement is protected by a conditional privilege is a question of law for the court." Reynolds Metals Co. v. Mays,547 So.2d 518, 524 (Ala. 1989).[25] Ayres claims that her alleged publications of the petition, her discussions of the matter with numerous individuals, and her communications with news reporters were all prompted by a duty, as a city-council member, to the citizens of the Town of Argo to inform them of what Ayres believed to be Mayor Jennings's illegal activities and to prompt an investigation concerning the dismissal of various speeding tickets in the Town of Argo.
We hold that Ayres has demonstrated that her alleged publications, insofar as they concerned possible illegal activities by Mayor Jennings, were prompted by a duty to inform the citizens of Argo of possible illegal behavior by the mayor, and to explain what, if anything, the city council planned to do about it. Ayres's communications concerning alleged misconduct by the mayor constituted a matter of public concern, and Ayres believed that the citizens of Argo had a legitimate interest in knowing whether Mayor Jennings was engaged in illegal activities and in knowing the city council's reaction to the allegations that he was.[26]
Furthermore, Ayres's discussions of the matter with various citizens were to inform them of the mayor's statements and to discuss the possibility of an investigation into Jennings's activities as mayor. Ayres's distribution of transcripts of the tape-recorded conversation and playing the tape recording for news reporters were also to bring attention to Jennings's statements surrounding the dismissal of Butler's speeding ticket and to inform the public of what Ayres believed to be possible illegal behavior by Mayor Jennings.[27] Because Ayres's communications were prompted by her duty to the citizens of Argo as a city council member to inform them of possible illegal actions by the mayor, Ayres has demonstrated a qualified privilege as to these communications.
In order to overcome the qualified privilege as to Ayres's publications concerning Jennings's alleged illegal activities, Butler must demonstrate that Ayres made the otherwise privileged communications with actual malice toward her. The affirmative defense of a qualified privilege is lost only if the plaintiff proves that the defendant made the privileged communication with actual malice. Nelson v. Lapeyrouse Grain Corp.,534 So.2d 1085, 1095 *Page 27 
(Ala. 1988). Actual malice can be shown by evidence of "`previous ill-will, hostility, threats, rivalry, other actions, former libels or slander, and the like . . . or by the violence of the defendant's language, the mode and extent of the publication, and the like.'"Webster, 494 So.2d at 36 (quoting Kenney v. Gurley, 208 Ala. 623, 626,95 So. 34, 37 (1923)).
Butler does not allege that Ayres acted with actual malice toward her, nor does the record support a finding that Ayres harbored any ill will, hostility, rivalry, or the like toward Butler. In fact, the record demonstrates that Ayres and Butler did not even know one another until the incidents surrounding this case occurred. Therefore, because Ayres's communications concerning possible illegal activity by the mayor were subject to privilege and because Butler failed to overcome that privilege, the trial court should have granted Ayres's motion for a JML as to Butler's claims against her.
We note that some of the statements in the transcript and tape Ayres distributed to newspaper reporters impugn Butler's chastity and are not related to matters of public concern, i.e., "my cousin used to get a little of that." Those statements are not relevant to Jennings's fitness for office and thus are not subject to the qualified privilege. However, Ayres is entitled to a JML as to Butler's claims concerning those statements. First, the statements will not support a claim for invasion of privacy by false light because it does not appear from any materials contained in the record that those statements were publicized by the newspaper reporters. The newspaper articles and the other publicity centered around the issue whether Jennings and Butler engaged in any improper activities pursuant to the dismissal of her ticket. None of the news articles mention Jennings's comments about Butler's chastity. Thus, under the legal analysis contained in Part I.A., Ayres distributed those statements to only two people and the statements did not receive the required publicity to support a false-light claim. Furthermore, the statements will not support a claim for slander under the analysis contained in Part I.B.1., because they do not allege that Butler committed an indictable offense and because Butler failed to plead and prove special damages. Finally, the statements will not support a claim for libel against Ayres because Butler did not allege libel against Ayres in her complaint or at trial.
 IV. Butler v. Town of Argo (case no. 1001496)
Butler argues that if any of the other defendants in this case — Jennings, Fore, or Ayres — are granted a new trial, then the judgment entered against the Town of Argo should be vacated and the case remanded for a new trial. The law is well-settled that a party who prevails in the trial court can appeal only the issue of the adequacy of the damages awarded at trial. Ex parte Krupp Oil Co., 727 So.2d 85 (Ala. 1998); Exparte Weyerhaeuser Co., 702 So.2d 1227 (Ala. 1996); DeBardeleben v.Tynes, 290 Ala. 263, 276 So.2d 126 (1973). Because Butler has failed to present this Court with an adverse ruling for review, and because Butler is not challenging the adequacy of the damages awarded against Argo, this appeal is dismissed.
 V. Butler v. Jennings et al. (case no. 1010017)
Butler's remaining arguments all concern the trial court's August 21, 2001, posttrial order purporting to remit and to apportion the damages awarded by the jury. Because we reverse the judgments entered in favor of Butler as to Jennings, Fore, and Ayres, this appeal is dismissed as moot. *Page 28 
 Conclusion
Jennings was entitled to a JML as to Butler's invasion-of-privacy, slander, and libel claims against him. Fore was entitled to a JML as to Butler's invasion-of-privacy and slander claims against him. Finally, Ayres was entitled to a JML as to Butler's invasion-of-privacy and slander claims against her based on absolute and qualified privilege. There are no remaining claims against Jennings, Fore, and Ayres; therefore, the judgment against them is reversed. Butler's appeal against the Town of Argo is dismissed because she prevailed at trial, and Butler's appeal against Jennings, Fore, and Ayres concerning damages is dismissed as moot.
1001496 — DISMISSED.
MOORE, C.J., and HOUSTON, SEE, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
LYONS, J., concurs in the result.
1002162 — REVERSED.
HOUSTON, SEE, LYONS, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., dissents.
1002163 — REVERSED.
MOORE, C.J., and HOUSTON, SEE, LYONS, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
1002164 — REVERSED.
MOORE, C.J., and HOUSTON, SEE, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
LYONS, J., concurs in the result.
1010017 — DISMISSED AS MOOT.
MOORE, C.J., and HOUSTON, SEE, LYONS, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
[1] The Town of Argo does not appeal from the judgment entered against it.
[2] It is not clear from the record whether Leonard resigned or was fired from his position as police chief.
[3] The transcript, with certain bracketed alterations, was entered into evidence at trial. The transcript of the tape-recorded conversation was made by Guy Martin, an attorney representing Larry Leonard and others in unrelated actions against the Town of Argo and Jennings.
[4] Kim Butler's name is actually "Kimberly Wise Butler."
[5] Butler testified that when Fore pulled her over, she got out of her car and approached the police vehicle because she initially believed that the police officer was a friend of hers.
[6] Jennings admitted at trial that he was mistaken in his comment that Butler and his cousin had had a relationship. Butler maintains that she never had a sexual relationship with any of Jennings's cousins.
[7] Fore testified that this name should read "John Wayne" or "Johnny Wayne," i.e., Fore.
[8] Jennings testified that not all of the statements contained in this paragraph were correctly attributed to him. He maintained that, at times, Fore broke in and that some of the statements are Fore's.
[9] Jennings testified that the first four sentences in this paragraph were actually spoken by Fore.
[10] Jennings testified that he made this statement.
[11] According to the testimony at trial, Bobby Smith had supported Jennings's opponent in the mayoral election.
[12] Ayres had vigorously supported Jennings's opponent in the mayoral election, and she was a witness for Jennings's opponent in the election contest. Ayres also provided an affidavit for Leonard's use in his unrelated action against the Town of Argo, the city council, and Jennings.
[13] It appears that at some point before trial Butler abandoned her negligent-infliction-of-emotional-distress claim and her separate negligence claim.
[14] It is unclear as to exactly what false information Butler claims Jennings communicated to Chief Watson and to the individuals in the clerk's office.
[15] Jennings further argues that he is entitled to a legislative privilege for all of his actions during city council meetings. Butler alleges that Jennings's actions and statements not related to matters of public interest are not privileged. However, the parties have not provided this Court any basis from which to determine whether Jennings's actions were legislative functions. See Part III.A. At any rate, we believe that it is unnecessary to reach this question, because even if Jennings's actions are not privileged, Butler has failed to produce substantial evidence demonstrating that he communicated false information about Butler during the city council meetings.
[16] The letter does not imply that Jennings and Butler discussed a dismissal of the ticket in exchange for a bribe. Bribery requires that a person offer, confer, or agree to confer something of value upon a public servant, rather than upon a general public entity.
"(a) A person commits the crime of bribery if:
 "(1) He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced. . . ."
§ 13A-10-61(a)(1), Ala. Code 1975.
[17] As mentioned above in note 16, supra, Jennings's and Butler's discussion about the ticket does not fit within the definition of bribery. See § 13A-10-61(a)(1), Ala. Code 1975.
[18] Jennings argues that he is entitled to a legislative privilege as to this claim. However, the parties do not provide any basis on which to determine whether Jennings's actions in taking the documents from Ayres and giving them to the clerk were legislative functions. See Part III.A., supra.
[19] Jennings makes several additional arguments concerning evidentiary issues, the trial court's instructions to the jury, the verdict form submitted to the jury, and the jury's damages award. In light of our disposition of the invasion-of-privacy and defamation claims against Jennings, it is unnecessary to reach these issues.
[20] It is unclear exactly what false information Butler alleges that Fore communicated to Bobby Smith, Chief Watson, and the police officer from the Springville Police Department.
[21] In her briefs to this Court, Butler argues extensively that Fore, Ayres, Bobby Smith, Larry Leonard, and Guy Martin were involved in a conspiracy to disseminate the tape recording and the transcript in an effort to discredit Jennings and to have him removed from office. However, at trial, Butler did not allege or argue a cause of action for conspiracy, nor did she state a cause of action against Smith, Leonard, or Martin. Furthermore, Smith, Leonard, and Martin were not called as witnesses by either party. Thus, we are left with only Butler's false-light and defamation claims against Fore.
[22] It appears from the record that in her pleadings and at trial Butler did not argue that she had a cause of action for libel against Fore, nor does she claim on appeal that Fore published libelous material against her.
[23] Fore makes numerous other arguments in his brief on appeal. However, in light of our disposition of the slander and false-light claims against him, we need not discuss those arguments.
[24] We note that in Ex parte Blue Cross Blue Shield of Alabama,773 So.2d 475 (Ala. 2000), this Court used the term "qualified privilege" to refer to the affirmative defense that previously had been referred to as "conditional privilege."
[25] The qualified privilege that serves as an affirmative defense to defamation actions also applies to any publications that may constitute an invasion of privacy. See Restatement (Second) of Torts § 652G (1977).
[26] We note that there is no evidence in the record to support Butler's allegations that Ayres was the individual who circulated the petition. However, even if Butler's assertions that Ayres circulated the petition are correct, we hold that this activity is subject to the qualified privilege. Although the petition calling for an investigation of Jennings incorrectly implied wrongdoing by Butler, its main purpose was to call for an investigation into Jennings's activities as mayor — specifically, whether Jennings was involved in illegal activities in the dismissal of speeding tickets.
[27] Although Ayres admits that she gave interviews to news reporters, there is absolutely no evidence in the record as to what she may have said to the reporters during the interviews. Therefore, it is unnecessary to further address those allegations.