Rel: April 21, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

––––––––––––––––––––––

### SC-2022-0721

––––––––––––––––––––––

**Daniel Flickinger**

**v.**

**Lawrence Tracy King and King Simmons Ford & Spree P.C.**

**Appeal from Jefferson Circuit Court**
**(CV-21-226)**

COOK, Justice.

In 2020, Daniel Flickinger, an attorney in Birmingham, posted a

message on his personal Facebook social-media page in which he

appeared to reference the death George Floyd, which occurred while Floyd was being arrested and was recorded. The social-media post, along with an allegedly "counterfeit" social-media "profile," was later shared with Flickinger's supervising attorney at his law firm by Lawrence Tracy King, an attorney with the Birmingham law firm of King Simmons Ford & Spree, P.C. ("the King law firm"). Shortly thereafter, Flickinger was forced to resign. Flickinger's post was also shared by members of a "private" Facebook group, who then posted a series of offensive comments about him both personally and professionally.

Flickinger sued King and the King law firm ("the King defendants"), asserting claims of defamation, invasion of privacy, and tortious interference with a business relationship. The King defendants filed a motion to dismiss Flickinger's claims pursuant to Rule 12(b)(6), Ala. R. Civ. P., and that motion was granted by the Jefferson Circuit Court. We affirm in part and reverse in part the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

<u>Facts and Procedural History</u>

At the time of the events underlying the present lawsuit, Flickinger

had been employed as a full-time litigator at Wainwright, Pope & McMeekin, P.C. ("WPM"), for approximately 11 years. According to Flickinger, during the course of his career with WPM, he had been active on various social-media platforms and had often posted "conservative political and cultural commentary" on those platforms. Flickinger maintained that, when he posted such commentary, he always did so in his "personal capacity" and that he never "listed his place of employment on his personal social media profiles or in conjunction with his personal social media posts."

It is undisputed that, in June 2020, Flickinger posted the following message on his personal Facebook page, apparently regarding the death of George Floyd:

> "Things I think about: If I were a seven-time felon, with my most recent prison stint stemming from robbing and holding a pregnant woman at gunpoint in her home, would I choose to die in a fentanyl and methamphetamine numbed strangulation if it meant being worshipped in a nationwide funeral and my family receiving millions of dollars? Purely hypothetical."

On June 9, 2020, Flickinger received a telephone call from his supervising attorney, Lonnie Wainwright, during which Wainwright revealed that King had contacted him regarding Flickinger's social-media

3

post. Wainwright asked that Flickinger meet with him the following day. According to Flickinger, shortly after speaking with Wainwright, he received a "cryptic tweet" from the King law firm's Twitter social-media account -- @KingSimmonsPC -- that contained a "large eyes emoji" along with one of Flickinger's posts from several days earlier on his personal Facebook page.[1]

The next day, June 10, 2020, Flickinger met with the partners of WPM. Although, according to Flickinger, the WPM partners at the meeting admitted that they "did not understand social media" and were "not on social media," they expressed that they were very concerned about the public connection between his social-media post and their law firm, and, according to Flickinger, one partner asked: "How could you do this to us?"

After Flickinger asked the WPM partners numerous times for a copy of the actual images sent to them by the King defendants, Flickinger says, "the managing partner … permitted [Flickinger] to view his phone,

---

[1]This was the first and only correspondence that Flickinger alleges that he received from the King defendants, and he contends that at no point did the King defendants inform him that they had contacted WPM.

which depicted an image that was generated, manufactured, sent, published, and/or distributed by Lawrence T. King and King Simmons Ford Spree, P.C. containing a counterfeit social media profile using [Flickinger's] professional credentials that [Flickinger] had never used in conjunction with personal social media posts." (Emphasis added.) According to Flickinger, the allegedly "counterfeit" social-media profile contained a professional photograph "appropriated" from WPM's Web site that, he said, he had never used on any of his personal social-media platforms as well as the name of Flickinger's employer, which, he maintains, he had "never advertised or shared in conjunction with any of his personal social media posts."

According to Flickinger, digitally merged with this "counterfeit" social-media profile were additional social-media posts appropriated from his personal social-media platforms that were critical of the mass nationwide violence that had been going on in the wake of George Floyd's death. Additionally, offensive comments about his initial social-media post about George Floyd's death had been added to that "counterfeit" profile to make it appear that third persons were commenting directly on the social-media post. Those comments included statements that

5

Flickinger was a "racist" and that WPM was "a business that supports racism."

Flickinger was then told that the WPM partners had had discussions with King about the King defendants' "ability and willingness to control the distribution of the false and defamatory images favorably for WPM." At the conclusion of the meeting, Flickinger was informed that either he must resign or WPM would pursue "other [more punitive] options." Flickinger resigned.

After Flickinger resigned, the WPM partners informed him that they had spoken on the phone with King a second time and that King had told them again about the King defendants' "ability and willingness to control the distribution of the false and defamatory images favorably for WPM." The very next day, the following "tweet" appeared on the @KingSimmonsPC Twitter page:

> "We represent a lot of hurt workers across Alabama, & spar w/lots of great defense lawyers. Those @ [WPM] (2 of whom I've know for well over 34 years) are as diligent, fair, upright, honest, & ethical as are found anywhere. Felt like saying it. #RESPECT."

Additionally, a Facebook page belonging to an individual who Flickinger alleges is a "co-conspirator" with the King defendants contained the

6

following message:

> "Now that [Daniel Flickinger] has been erased, I want to say that the firm he worked for has a great reputation in town and they are honest, professional, kind people. Good for them for such a fast and definitive response."

Flickinger subsequently discovered that the King law firm's Twitter page contained "tweets" allegedly authored by the King defendants "gloating over the employment termination of private citizens solely on the basis of citizens expressing thoughts and opinions with which [the King defendants] disagreed." For example, Flickinger noticed that, before the events underlying the present action occurred, the following post appeared on the @KingSimmonsPC Twitter page regarding the employment termination of a different person:

> "5/12/2020: Here's a white guy that got fired by his law firm employer. He wouldn't wear a mask in a 'ghetto store' and bragged about his guns and ammo. What a turd…"

In addition, Flickinger alleges that he later discovered that members of a 1,500-plus member "private" Facebook group named "CALLING OUT ALABAMA BUSINESSES THAT SUPPORT RACISM" had been posting the following statements accusing him of being a "racist" and accusing WPM of being a "business that supports racism":

> - "Calling Out Alabama Businesses That Support Racism… So

> [Daniel Flickinger] is a lawyer! Who knows what kinda ethical damage he's done?! He works at Wainwright, Pope, McMeekin, P.C."

- "I went to school for years with this asshole… Racist condones running over protestors a few posts down…"

- "….DEFINITELY email [Daniel Flickinger's] firm. Firms are firing people left and right for being racist scumbags (and rightfully so)"

- "Ugly inside and out"

- "What a f***ing piece of s**t"

According to Flickinger, King was a member of this "private" Facebook group, something that King now denies.

As a result of this conduct, Flickinger filed suit against the King defendants. In his second amended complaint, Flickinger alleged claims of defamation, invasion of privacy, and tortious interference with a business relationship. It does not appear that Flickinger averred that the content of his social-media post itself was doctored; instead, he averred that the image sent to his employer is actionable because it was falsely made to appear as if he was posting from an account linked to his place of employment. He also alleged that the false and defamatory statements added to the image (that is, the comments by others) were actionable. As a "direct result of false and defamatory materials generated,

8

manufactured, sent, published and/or distributed by Defendants among the partners of WPM," Flickinger alleged that he was constructively discharged.

The King defendants filed a motion to dismiss in which they alleged that Flickinger's "claims do not contain the necessary elements for any of those causes of action and thus the Complaint, on its face, must be dismissed," asserting that attributing Flickinger's own statements from his personal Facebook page to him was not defamatory. They also argued that Flickinger's tortious-interference claim was due to be dismissed because, they said, they never intended for his employment with WPM to be terminated and there was nothing wrongful about their decision to truthfully share the content of Flickinger's Facebook post with WPM. Finally, the King defendants argued that Flickinger's invasion-of-privacy claim was due to be dismissed because, they said, the social-media statements attributed to him were not "false" and were not "publicized."

In his response to their motion, Flickinger disputed that he had failed to satisfy the elements of his claims. Specifically, Flickinger disputed the King defendants' assertion that they did not intend to bring about the termination of his employment by sharing his Facebook post

with WPM. In support of his response, Flickinger argued that various tweets from the @KingSimmonsPC Twitter page "gloatingly revel in the employment termination of American citizens, who … expressed personal opinions that ran afoul of [the King defendants'] self-described 'progressive,' political orthodoxy."

The trial court conducted a hearing on the motion.[2] Following that hearing, the trial court entered a judgment in which it stated:

"In his Complaint, [Flickinger] asserts claims for defamation, invasion of privacy/false light, [and] tortious interference …. All of these claims have their genesis in the fact that [Flickinger] was terminated from his at-will employment as an associate attorney at a law firm for making a social [media] post on his personal social media account. … The Complaint makes clear that [Flickinger] knowingly and purposefully made the social media post. The Complaint also makes clear that [Flickinger] was an associate attorney at the law firm at the time he made the social media post. Finally, the Complaint makes clear that [Flickinger] was terminated from his employment with the law firm for making the social media post while he was an associate attorney at the law firm.

"This lawsuit states no claims against [Flickinger's] former law firm; i.e., there is no allegation that the law firm illegally terminated [Flickinger] from his employment. Rather, this suit seeks to advance tort claims against third-parties who are alleged to have linked the fact that [Flickinger] made the social media post to the fact that [Flickinger] was an associate attorney with the law firm, which resulted in the

_____

[2]A transcript of the hearing was not included in the record on appeal.

10

termination of [Flickinger's] employment at the firm.

"Because [Flickinger's] Complaint acknowledges that all of the above facts are true, none of the counts in the Complaint states a claim upon which relief can be granted. See Mooneyham v. State Bd. of Chiropractic Examiners, 802 So. 2d 200, 203 (Ala. 2001) ('It is well established that truth is an absolute defense against a defamation claim. Because Mooneyham's defamation claim alleges a truthful communication, he cannot prevail even if we accept his allegations as true. Therefore, the trial court properly dismissed this claim against the defendants.') (internal citations omitted); Borden v. Malone, 327 So. 3d 1105, 1112 (Ala. 2020) ('a court may dismiss a complaint for failure to state a claim based on an affirmative defense when the allegations of the complaint, on their face, show that the defense bars recovery'); Regions Bank v. Plott, 879 So. 2d 239, 24 (Ala. 2004) ('unlike defamation, truth is not an affirmative defense to a false-light [invasion-of-privacy] claim; rather, "falsity" is an element of the plaintiff's claim, on which the plaintiff bears the burden of proof'); Bosarge v. Bankers Life Co., 541 So. 2d 499, 501 (Ala. 1989) ('Bosarge cannot complain because Bankers Life notified his clients that he was no longer a full-time associate of Bankers Life. That was obviously a truthful notification, because Bosarge had been terminated as an agent for Bankers Life.') …."

Based on the foregoing, the trial court granted the King defendants' motion and dismissed Flickinger's claims with prejudice. Shortly thereafter, Flickinger filed a postjudgment motion that was denied. He now appeals.

## Standard of Review

"'On appeal, a dismissal is not entitled to a

11

> presumption of correctness. The appropriate standard of review under Rule 12(b)(6)[, Ala. R. Civ. P.,] is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader <u>could prove any set of circumstances that would entitle her to relief</u>. In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether she may possibly prevail. We note that a Rule 12(b)(6) dismissal is proper only when it appears <u>beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief</u>.'

"<u>Nance v. Matthews</u>, 622 So. 2d 297, 299 (Ala. 1993) (citations omitted)."

<u>Lloyd Noland Found., Inc. v. Healthsouth Corp.</u>, 979 So. 2d 784, 791 (Ala. 2007) (emphasis added).

<u>Discussion</u>

On appeal, Flickinger argues that the trial court erred by dismissing his case at the pleading stage and resolving what he says were "highly disputed factual contentions injected by [the King defendants] purporting to defend their motives and the reason behind [his] employment termination." Flickinger's brief at 26. As explained in more detail below, we conclude that the trial court properly dismissed Flickinger's defamation and invasion-of-privacy claims but should not

12

have dismissed his tortious-interference claim.

## I. Defamation

First, Flickinger contends that he has pleaded actionable defamation in the present case. According to Flickinger, the images "curated and distributed" by the King defendants contained "false and defamatory statements" that, "when considered in the societal context of the unhinged Summer 2020 cultural climate," indicate "that [he] conducted his legal profession in a racist manner." Flickinger's brief at 28. The King defendants contend, however, that the trial court properly dismissed this claim because, they say, linking Flickinger's publicly viewable photograph from WPM's Web site as a means of identifying him as the one who posted the social-media post at issue is not defamatory.

In Alabama, the elements of a cause of action for defamation are:

> "'"1) [A] false <u>and</u> defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting to at least negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement."'"

<u>Dolgencorp, LLC v. Spence</u>, 224 So. 3d 173, 186 (Ala. 2016) (quoting <u>Wal-Mart Stores, Inc. v. Smitherman</u>, 872 So. 2d 833, 840 (Ala. 2003), quoting in turn <u>McCaig v. Talladega Publ'g Co.</u>, 544 So. 2d 875, 877 (Ala. 1989)).

13

The trial court cited <u>Mooneyham v. State Board of Chiropractic Examiners</u>, 802 So. 2d 200, 201-04 (Ala. 2001), in dismissing Flickinger's defamation claim on the basis that he had not satisfied the first element (falsity). In <u>Mooneyham</u>, a licensed chiropractor was investigated by the State Board of Chiropractic Examiners for violations of various laws, rules, or regulations applicable to the chiropractic profession. Following the investigation, the Board revoked the chiropractor's license and ordered him to pay a fine. It then shared the results of its investigation with certain third parties, including the State of Florida and the Federation of Chiropractic Licensing Boards.

Almost two years later, the chiropractor obtained a reversal of the Board's determination. He then filed suit against the Board and some of its members in which he alleged, among other things, that the Board's decision to publish the findings of its investigation to third parties constituted defamation. The Board and the other individual defendants moved to dismiss the chiropractor's complaint, and the trial court granted their motion.

On appeal, this Court affirmed the dismissal of the chiropractor's defamation claim. In support of its holding, this Court stated:

14

"We are particularly interested in [the chiropractor's] allegations that the Board found him guilty of four violations of Alabama's professional code of conduct for chiropractors. We note that [the chiropractor] alleged as a fact that the Board's adjudication of his disciplinary matter occurred before the time when he alleges certain members of the Board authorized communications to third parties notifying those third persons of the conclusion and result of the Board's proceedings against him.

"[The chiropractor's] complaint indicates that he has essentially pleaded that the Board communicated accurate and true information -- at the time the alleged communications were authorized and at the time they were made, the Board had made its ruling and that ruling had not yet been reversed by the Montgomery Circuit Court. It is well established that truth is an absolute defense against a defamation claim. Drill Parts & Serv. Co. v. Joy Mfg. Co., 619 So. 2d 1280, 1289 (Ala. 1993); Foley v. State Farm Fire & Cas. Ins. Co., 491 So. 2d 934, 937 (Ala. 1986); and Liberty Loan Corp. of Gadsden v. Mizell, 410 So. 2d 45, 49 (Ala. 1982). Because [the chiropractor's] defamation claim alleges a truthful communication, he cannot prevail even if we accept his allegations as true. Therefore, the trial court properly dismissed this claim against the defendants."

802 So. 2d at 203 (emphasis added).

Unlike in Mooneyham, here, Flickinger alleged in his complaint that the King defendants had shared a "counterfeit" social-media profile that appeared to show that Flickinger was making a controversial political statement on behalf of WPM. Although Flickinger does not dispute that the statement in the post that was shared was his and was,

15

therefore, truthful, he pleaded that the remainder of the post -- coupled with the "counterfeit" social-media profile -- falsely associated his political views with WPM.

The affirmative association of a potentially incendiary social-media post with the employer of the writer of the post could be relevant to a reader and would certainly be relevant to the employer. In fact, one of WPM's partners admitted to Flickinger that he "did not understand social media" and was not "on social media." It would be reasonable to conclude that he believed that readers of the post might make this false association. Thus, under these circumstances, we agree with Flickinger that the nature of this social-media post was in fact "false."

However, our caselaw makes clear that it is not enough for a statement to be "false," it must also be "defamatory." This Court has previously stated that "'[t]he test to be applied [by the court] in determining the defamatory nature of an imputation is that meaning which "would be ascribed to the language by a reader or listener of ordinary or average intelligence, or by a 'common mind.'"'" Finebaum v. Coulter, 854 So. 2d 1120, 1128 (Ala. 2003) (citations omitted). Writings -- or, in this case, screenshots depicting images of writings -- can be

"defamatory" if they """tend[] to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.""" Blevins v. WF Barnes Corp., 768 So. 2d 386, 389-90 (Ala. Civ. App. 1999) (citations omitted).

Additionally, """any false and malicious publication, when expressed in printing or writing, or by signs or pictures, is a libel [if it] … tends to bring an individual into public hatred, contempt or ridicule …."" Butler v. Town of Argo, 871 So. 2d 1, 19 (Ala. 2003) (citations omitted). Finally, if the depictions "employed in the allegedly libelous publication are understood to impute dishonesty or corruption to an individual, they are actionable." Camp v. Yeager, 601 So. 2d 924, 927 (Ala. 1992).

Here, Flickinger does not dispute that the social-media post at the heart of this lawsuit was in fact written by him. He also does not allege that the content of that post was manipulated in any way before it was shared with the partners at WPM.

In order to adequately allege a claim of defamation, Flickinger must allege that the false association -- i.e., that in making that post he was doing so as a representative of his law firm -- is what brought him "into public hatred, contempt or ridicule" or "imput[ed] dishonesty or

17

corruption" to him. Nowhere in his second amended complaint, however, does Flickinger allege that the "counterfeit" social-media profile associated with the post generated such outrage and hatred. Instead, it was the content of his post that he alleges generated such outrage and hatred. Thus, under these circumstances, Flickinger has failed to demonstrate that the "counterfeit" social-media profile associated with the post at issue amounted to defamation.

However, in his complaint Flickinger also points to other statements about him that were posted by members of the "private" Facebook group that he alleges were defamatory, including a statement that he was a racist. Although Flickinger appears to concede that the King defendants did not author any of these statements, he nevertheless alleges that the King defendants conspired with the creators of the "private" Facebook group to make such statements and then transmitted them to WPM.

Flickinger argues that, given the intense social unrest in June 2020, there is even greater reason to construe these allegations as raising valid defamation and conspiracy claims. In support of his contention, Flickinger cites Gibson Bros. v. Oberlin College, 187 N.E.3d 629 (Ohio

18

Ct. App. 2022), in which the Ohio Court of Appeals affirmed a defamation judgment in favor of a plaintiff bakery against Oberlin College based on the fact that college employees had distributed flyers created by nonparty students that labeled the bakery as a "RACIST establishment with a LONG ACCOUNT OF RACIAL PROFILING AND DISCRIMINATION" at a 200-300 person protest held shortly after an incident involving the arrest of a black Oberlin student who was subdued by a bakery employee after the employee had witnessed the student shoplifting. Id. at 639. In support of its holding, the Ohio Court of Appeals emphasized the importance of the broader societal context of the ongoing campus tension over "racial injustice" that served to amplify the reputational harm to the bakery and the force of the false accusations of racial profiling against the bakery. Id. at 645.

In response, the King defendants contend that accusing someone of being a racist is nothing more than an opinion and is, therefore, not actionable. Specifically, they argue that a false and defamatory statement must be a statement of fact and that, therefore, the expression of an opinion cannot be deemed "'actionable defamation.'" Williams v. Marcum, 519 So. 2d 473, 477 (Ala. 1987) (plurality opinion) (quoting the

trial court's order). Although the King defendants acknowledge that our appellate courts have not squarely addressed the question whether accusing someone of being "racist" can be defamatory, they note that, in Logan v. Sears, Roebuck & Co., 466 So. 2d 121 (Ala. 1985), this Court held that a reference to a gay man as being "queer as a three-dollar bill" did not amount to defamation.

Further, the King defendants provide many pages of citations to decisions from other jurisdictions that hold that a statement regarding whether someone is "racist" or "supports racism" is a statement of opinion and is thus not actionable as defamation. See, e.g., Stevens v. Tillman, 855 F.2d 394, 402 (7th Cir. 1988) (noting that calling someone a racist "is not actionable unless it implies the existence of undisclosed, defamatory facts"); Cummings v. City of New York, No. 19-cv-7723(CM)(OTW), Feb. 4, 2020 (S.D.N.Y. 2020) (not reported in Federal Supplement) (holding that reference to plaintiff as racist does not have a "precise meaning capable of sustaining a defamation action"); Jorjani v. New Jersey Inst. of Tech., No. 18-cv-11693, Mar. 12, 2019 (D.N.J. 2019) (not reported in Federal Supplement) (recognizing that an allegation of racism alone is not actionable but that, if a statement falsely implies that someone is

engaging in specific acts, such as making racist statements or refusing to employ a person of a certain race, it may be defamatory); and <u>Squitieri v. Piedmont Airlines, Inc.</u>, No. 3:17CV441, Feb. 16, 2018 (W.D.N.C. 2018) (not reported in Federal Supplement) (holding that statements indicating that the plaintiff is racist are "clearly expressions of opinion that cannot be proven as verifiably true or false"); <u>see</u> <u>also</u> 3 Dan B. Dobbs et al., <u>The Law of Torts</u> § 572 (2d ed. 2011) ("'[R]acist' is sometimes said to be mere name-calling and not actionable in some contexts[; however,] the term can be actionable where it plainly imputes acts based on racial discrimination."); 50 Am. Jur. 2d <u>Libel and Slander</u> § 200 (2017).

In the present case, third parties calling Flickinger a racist in response to his statement amounts to nothing more than the expression of their opinions. The third-party statements identified in Flickinger's complaint and quoted earlier in this opinion do not indicate or imply that Flickinger committed racially discriminatory acts, which, as the caselaw above indicates, could change the analysis of the issue.[3] Although we

---

[3]We note briefly that, although other alleged posts by members of the "private" Facebook group alleging that Flickinger had a history of committing professional-ethics violations might well be actionable, <u>see</u> <u>Tanner v. Ebbole</u>, 88 So. 3d 856, 857-68 (Ala. Civ. App. 2011) (affirming defamation judgment in favor of plaintiff tattoo artist when defendants

should not be understood as condoning the casual use of such a powerful label, in the present case, the third parties' use of the term "racist" is not actionable as Flickinger's claims are currently pleaded. The language in some of the other posts about Flickinger made by members of the "private" Facebook group, while ill-considered, are likewise not actionable defamatory statements. In <u>Logan</u>, this Court stated:

> "'Our manners, and with them our law, have not yet progressed to the point where we are able to afford a remedy in the form of tort damages for all intended mental disturbance. Liability of course cannot be extended to every trivial indignity. There is no occasion for the law to intervene with balm for wounded feelings in every case where a flood of billingsgate is loosed in an argument over a back fence. The plaintiff must necessarily be expected and required to be hardened to a certain amount of rough language, and to acts that are definitely inconsiderate and unkind. There is still, in this country at least, such a thing as liberty to express an unflattering opinion of another, however wounding it may be to his feeling; and in the interest not only of freedom of speech but also of avoidance of other more dangerous conduct, it is still very desirable that some safety valve be left through which irascible tempers may blow off relatively harmless steam.'"

466 So. 2d at 124 (quoting W. Prosser, <u>Law of Torts</u> 54-55 (4th ed. 1971)).

---

displayed false statements suggesting the plaintiff's methodology violated best health and safety practices), the statements pleaded in Flickinger's complaint and quoted above speculate about whether Flickinger's behavior was ethical but do not actually state that he has committed any professional-ethics violations.

Because Flickinger has failed to demonstrate that the posts at issue constitute defamatory statements, he has failed to meet the first element for a defamation cause of action. We, therefore, need not address the remaining elements of such a claim and conclude that the trial court properly dismissed this claim.

## II. Tortious Interference

Next, Flickinger contends that the trial court erred in dismissing his tortious-interference claim. The elements of a prima facie tortious-interference claim include: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." White Sands Grp., L.L.C. v. PRS II, LLC, 32 So. 3d 5, 14 (Ala. 2009).

Historically, Alabama has recognized the employer-employee relationship as a type of "protectible business relationship" underlying a tortious-interference claim. See generally Gross v. Lowder Realty Better Homes & Gardens, 494 So. 2d 590, 593 (Ala. 1986) (noting that interference with an employer-employee relationship can form the underlying basis for a tortious-interference cause of action); and James

23

S. Kemper & Co. Se. v. Cox & Assocs., Inc., 434 So. 2d 1380, 1386 (Ala. 1983) (same).

Here, it is undisputed that Flickinger was employed by WPM and, thus, that a protectible employer-employee relationship existed. It is also undisputed that the King defendants were aware of this relationship because they were the ones who reached out to Flickinger's supervising attorney and shared the Facebook post at issue with him. They were also strangers to that relationship because neither King nor the King law firm have any affiliation with WPM. Finally, it is undisputed that Flickinger has suffered damage because he has lost his job.

What is disputed, however, is whether Flickinger adequately alleged that the King defendants "intentionally interfered" with his employer-employee relationship with WPM. Flickinger points to two "tweets" that the King defendants allegedly made, gloating about the firing of other private citizens and about his discharge from WPM, along with a direct message that was sent to him from the King law firm Twitter account the night before his employment was terminated in support of his contention that the King defendants "intentionally interfered" with that relationship. Flickinger asserts that these

24

allegations alone sufficiently plead a claim that the King defendants intentionally interfered with his employer-employee relationship with WPM.

Relying on this Court's decision in S.B. v. Saint James School, 959 So. 2d 72 (Ala. 2006), the King defendants argue, however, that to sufficiently plead an allegation of intentional interference a plaintiff must allege that the defendant "coerced" a third party into acting against the plaintiff. According to the King defendants, like in Saint James School, there is nothing in this case indicating that they "coerced" WPM into terminating Flickinger's employment. Instead, they contend that they merely "alerted" WPM to Flickinger's Facebook post that had been shared on the "private" Facebook page and that they were acting with the best interests of WPM in mind. They also emphasize that at no point did they suggest that WPM confront Flickinger about his post or take any disciplinary action against him in light of that post. According to the King defendants, their only motivation in sharing this information was to protect WPM from being falsely labeled as a racist business. In support of these contentions, the King defendants point to affidavits filed by WPM partners that the King defendants submitted in support of a motion to

25

change venue in which those WPM partners state that the King defendants did not ask that Flickinger's employment be terminated.[4]

The King defendants' reliance on Saint James School in support of its contention here is misplaced. In White Sands Group, supra, this Court specifically overruled older opinions, including Saint James School, that required a party asserting a tortious-interference claim to make "a showing of fraud, force, or coercion." 32 So. 3d at 14. Additionally, contrary to the King defendants' contentions, Flickinger has asserted allegations in his complaint that would support an inference of intent to interfere with his employer-employee relationship with WPM, at least at the pleading stage. We also cannot ignore the fact that the termination of Flickinger's employment occurred almost immediately

_____

[4]The affidavits cited by the King defendants are not properly before this Court. The trial court did not convert the motion to dismiss into a summary-judgment motion -- something that would have required notice and compliance with the requirements of Rule 56, Ala. R. Civ. P. In fact, the trial court did not even indicate that it considered the affidavits. Thus, we do not consider the affidavits. The King defendants argue that we can consider them because they were appended to the mandamus petition previously filed in this action (concerning venue), and they cite Ex parte Alabama Power Co., 280 Ala. 586, 196 So. 2d 702 (1967), in support of their position. However, Alabama Power was decided before the Alabama Rules of Civil Procedure were adopted and concerned a unique procedural posture (presuit discovery). It is of no precedential value in this case and is contrary to current Alabama law.

after WPM was contacted by King. See, e.g., Thomas v. Williams, 21 So. 3d 1234 (Ala. Civ. App. 2008) (reversing judgment dismissing intentional-interference claim when firing of employee occurred soon after phone call from defendant to employer). Based on the foregoing, we conclude that the trial court erred in dismissing Flickinger's tortious-interference claim.

## III. Invasion of Privacy

Flickinger next contends that the trial court erred in dismissing his invasion-of-privacy claim. This Court has defined the tort of invasion of privacy as the "'intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.'" Rosen v. Montgomery Surgical Ctr., 825 So. 2d 735, 737 (Ala. 2001) (quoting Carter v. Innisfree Hotel, Inc., 661 So. 2d 1174, 1178 (Ala. 1995)). The tort of invasion of privacy consists of four limited and distinct wrongs:

> "'(1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.'"

Saint James School, 959 So. 2d at 90 (quoting Johnston v. Fuller, 706 So.

2d 700, 701 (Ala. 1997)). Each of these categories has distinct elements, and each category "'establishes a separate privacy interest that may be invaded.'" Regions Bank v. Plott, 897 So. 2d 239, 243 (Ala. 2004) (quoting Doe v. High-Tech Inst., Inc., 972 P.2d 1060, 1065 (Colo. App. 1998)).

Flickinger argues that the King defendants invaded his privacy (1) by putting him in a false position or "false light" in the public eye and (2) by appropriating some element of his personality for a commercial use. We will address each argument in turn.

First, a party may be subjected to liability under a false-light invasion-of-privacy claim when that party

> "'"gives publicity to a matter concerning another that places the other before the public in a false light … if
>
> > "'"'(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > "'"'(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'"'"

Regions Bank, 897 So. 2d at 244 (citations omitted; emphasis added). This Court has explained that a party "gives publicity" to a matter by showing that false and highly offensive material has been communicated

"'<u>to so many persons</u> that the matter must be regarded as substantially certain to become <u>one of public knowledge</u>.'" <u>Butler</u>, 871 So. 2d at 13 (quoting <u>Restatement (Second) of Torts</u> § 652D cmt. a (Am. L. Inst. 1977)) (emphasis added).

In his second amended complaint, Flickinger alleged that the King defendants and their coconspirators in the "private" Facebook group

> "deliberately created, manufactured, and published, shared, and/or distributed images falsely and maliciously describing the Plaintiff in his professional capacity and/or as a corporate representative of his former employer as a 'racist,' 'a business that supports racism,' a person who has advocated for running over protestors, and as a lawyer who has committed ethics violations among a group of at least 1,500 people for the stated purpose of 'eras[ing]' the Plaintiff or to pressure Plaintiff's former employer into terminating the Plaintiff's employment relationship."

However, we cannot say that publication of statements to this "private" group would make those statements essentially "public knowledge." In fact, as the King defendants point out, 1,500 is a tiny fraction of the population of Jefferson County. They further note that, since being fired from WPM, Flickinger himself has publicized this dispute on other social-media platforms. Moreover, with regard to the statements made by members of the "private" Facebook group that Flickinger was a "racist," we cannot say that those statements, in these circumstances, are "highly

29

offensive." Under these circumstances, Flickinger failed to allege a claim of invasion of privacy based on "false light."[5]

With regard to commercial appropriation, this Court has previously stated:

> "Restatement (Second) of Torts, § 652C, states that liability for this wrong arises when one's name or likeness is 'appropriated' by another to the other's 'use or benefit.' Comment d to this section states, in part:
>
>> "'No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.'"

Schifano v. Greene Cnty. Greyhound Park, Inc., 624 So. 2d 178, 181 (Ala. 1993). To illustrate, in Schifano, patrons of a dog-racing park were photographed as they sat in a section of the park that could be reserved

---

[5]We should not be understood as holding that publicizing a matter to only 1,500 persons is never sufficient to support a false-light invasion-of-privacy claim. Compare Butler v. Town of Argo, 871 So. 2d 1, 13 (Ala. 2013) (noting that distributing a handbill to a "large" number of people might satisfy the publicity requirement). However, at least in this context, publishing matters to this "private" Facebook group regarding a plaintiff living in the metro Birmingham area did not make those matters essentially "public knowledge."

by interested groups. The park printed the photograph in an advertising brochure. The patrons in the photograph were not identified by name. The photograph was taken by a camera mounted on a tripod in full view of, and only a few feet from, the patrons being photographed.

The patrons sued the park, alleging invasion of privacy based on commercial appropriation of their likenesses. The trial court entered a judgment for the park.

As the quote above indicates, this Court, quoting the Restatement (Second) of Torts § 652C cmt. d, noted that "'[i]t is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.'" Schifano, 624 So. 2d at 181. Because there was "no unique quality or value in the [patrons'] likenesses that would result in commercial profit to the [p]ark simply from using a photograph that included them," id., this Court concluded that the patrons could not prevail.

In his second amended complaint, Flickinger alleged:

"[T]he Defendants maliciously appropriated misleadingly manipulated elements of the Plaintiff's personal likeness for the commercial purpose of pressuring Plaintiff's former employer into terminating its business relationship with the

31

Plaintiff. Defendants further maliciously appropriated and misleadingly manipulated elements of the Plaintiff's personal likeness for the commercial purpose of flexing their power and influence within the Alabama workers' compensation bar to serve as the political and ideological gatekeepers of those who may earn a living practicing workers' compensation defense law while also practicing fundamental First Amendment freedoms of speech and thought."

Other than accusing the King defendants of "maliciously" and "misleadingly" appropriating his "personal likeness for the commercial purpose of pressuring [his] former employer into terminating its business relationship" with him and "for the commercial purpose of flexing their power and influence within the Alabama workers' compensation bar," Flickinger does not otherwise allege any "unique quality or value in [his social-media presence] that would result in commercial profit to" the King defendants. Id. at 181. Thus, under these circumstances, Flickinger has failed to allege that his privacy was invaded in this way.

Based on the foregoing, the trial court properly dismissed Flickinger's invasion-of-privacy claim.

<u>Conclusion</u>

For the foregoing reasons, we affirm the trial court's judgment insofar as it dismissed Flickinger's defamation and invasion-of-privacy claims. However, we reverse the trial court's judgment insofar as it

32

dismissed Flickinger's tortious-interference claim, and we remand the cause for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Parker, C.J., and Wise, Sellers, and Stewart, JJ., concur.